2013 CO 55

The PEOPLE of the State of Colorado, Petitioner

v.

Lance Patrick BRUNSTING, Respondent

Supreme Court Case No. 09SC323

Supreme Court of Colorado, En Banc.

July 1, 2013

Attorneys for Petitioner: John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado

Attorneys for Respondent:Douglas K. Wilson, Public Defender, Joseph Paul Hough, Deputy Public Defender, Denver, Colorado

Justice BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this appeal, we consider the exigent circumstances exception to the Fourth Amendment's warrant requirement as it applies to the emergency created when officer safety is placed in jeopardy. We hold that officer safety concerns fall within the exigent circumstances exception when "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect

the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." [1] We apply this test to the record in this case, and we conclude that the deputy sheriff's initial entry into the defendant's curtilage was justified by the exigent circumstances exception.[2] We do not consider, nor did the court of appeals consider, conduct by law enforcement in response to observations made after officer safety concerns caused the first deputy to enter the curtilage. Accordingly, we reverse the judgment of the court of appeals. We remand to that court to consider the remainder of the issues raised on appeal concerning the conduct by law enforcement that occurred after the first deputy crossed into the defendant's curtilage and to consider all other outstanding issues.

## I. Facts and Procedural History

¶ 2 The Arapahoe County Sheriff's Department received a call from R. Talent, who claimed to have spotted his stolen van in the driveway of a house that was later determined to be the residence of the Respondent, Lance Brunsting. Talent told police that he suspected that a man named Lance stole his van. Additionally, Talent reported to police that Lance was known to carry a gun and was associated with dangerous people who were involved in drugs and who were known to carry guns. Talent explained that he had found his van at Brunsting's residence after searching the neighborhood. Before the deputies arrived, Talent reportedly approached the home to speak with Brunsting and overheard people inside discussing guns. According to Talent, he then retreated and called the Sheriff's Department.

¶ 3 Concerned with the report of guns at the residence, the Sheriff's Department dispatched five deputies and a sergeant to the location identified by Talent. The officers arrived at the residence at approximately 11:00 p.m. and met Talent in front of the house. The house was illuminated only by a single light above the garage on the side of the house.

¶ 4 As deputies interviewed Talent, a woman and two juveniles exited the house. The woman identified herself as the owner of the house. The deputies informed the owner about the stolen van allegation, and she denied knowledge of the van and its purported theft. The owner also confirmed to the deputies that a man named Lance rented out her basement, and she informed the officers that four people were inside the house. When the deputies asked for permission to enter the house, she denied the request. The owner raised her voice throughout the interview, which led Deputy Carroll to conclude that she sought to alert the remaining occupants in the house to the deputies' presence.

¶ 5 At the same time, Talent became impatient with the investigation and told the deputies he would knock on the residence's door unless they did. Deputy Carroll then approached the van parked in the driveway. He observed that the stereo and speakers had been stripped from the van, consistent with Talent's theft claim.

¶ 6 The deputies attempted to reach the house's occupants by phone, and when that failed, they decided to knock on the front door. Just before they knocked, the deputies noticed security cameras positioned around the home's front perimeter. The cameras raised officer safety concerns with Sergeant Dennis, the supervisor on duty. Specifically, he expressed concern that individuals within the house would know the deputies' positions and movements and would use that information to ambush them.

¶ 7 Because of his concern that their position left the deputies vulnerable to a confrontation with one or more armed suspects, Sergeant Dennis ordered deputies to monitor the backyard from the east and west sides of the home in case someone were to emerge from the back side of the residence and confront them. At the west side of the

1. *Storey v. Taylor,* 696 F.3d 987, 993 (10th Cir. 2012).

2. Throughout its Fourth Amendment jurisprudence, the United States Supreme Court has employed the term "curtilage" to mean "the area immediately surrounding and associated with the home." *Florida v. Jardines,* — U.S. —, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting *Oliver v. United States,* 466 U.S. 170, 176, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).

house, Deputy Carroll was assigned to a position on the house's driveway next to the open gate of a waist-high chain-link fence that separated the right-hand side of the driveway from the backyard. As he approached the side of the house, however, Deputy Carroll realized that a security camera had been hung over the garage door and was pointed at the driveway, directly at Deputy Carroll's assigned position. As a result, Deputy Carroll grew concerned that the house's occupants would observe him standing in the driveway and that he would be vulnerable to shots fired by the reportedly armed occupants from the cover of the house's darkened windows. In order to mitigate the potential threat from within the house and to protect Sergeant Dennis from ambush, Deputy Carroll avoided the cameras, entered the backyard through the open gate, and hid in the shadows of a nearby bush.[3]

¶ 8 After Deputy Carroll entered the property, a rapid series of events led to the detention of four individuals as well as the discovery of guns and evidence consistent with the manufacture of methamphetamine.[4] Consequently, the deputies arrested several individuals, including Brunsting.

¶ 9 The prosecution charged Brunsting with several felonies related to the manufacture of methamphetamine.[5] Relevant to this appeal, he moved to suppress the evidence found in the house, arguing that the deputies' entry into the backyard violated his Fourth Amendment rights.

¶ 10 The trial court found that Deputy Carroll entered the residence's curtilage out of concern for officer safety and concluded that the evidence should not be suppressed. The trial judge explained that to ask officers to cease their investigation and "disregard their training as police officers and their obligation to protect us ... defies logic." The trial court found that because Talent insisted on confronting the house's occupants, the deputies could not have withdrawn to seek a search warrant without leaving behind a dangerous and volatile situation. The trial court also found that Deputy Carroll's entry into Brunsting's backyard was reasonable and was motivated by reasonable concern for his safety: "the police officers had a right to go into the backyard of this house to protect themselves, ... and their entry into the backyard was reasonable." Accordingly, the court denied Brunsting's suppression motion.

¶ 11 In a subsequent trial, a jury convicted Brunsting of the charged offenses. He appealed.

¶ 12 The court of appeals reversed the trial court's denial of the suppression motion and determined that, while the deputies possessed probable cause to believe a theft occurred, no exigent circumstance permitted Deputy Carroll to enter the backyard. *People v. Brunsting*, 224 P.3d 259, 265 (Colo. App.2009). Therefore, the court of appeals held that such entry violated Brunsting's Fourth Amendment rights. *Id.* The court of appeals declined to address Brunsting's remaining issues on appeal, including several constitutional violations that Brunsting alleged occurred after Deputy Carroll entered the backyard.[6] *Id.* at 266.

---

3. Photographs of the backyard admitted into evidence at the suppression hearing show bushes next to the chain-link fence.

4. The court of appeals held that evidence seized subsequent to Deputy Carroll's entrance into the backyard should have been suppressed by the trial court. Therefore, the court of appeals did not determine whether the actions of law enforcement after Deputy Carroll made entry into the backyard were lawful, and the legality of those actions is not before this court.

5. These charges included Possession of Chemicals or Supplies to Manufacture a Schedule II Controlled Substance, section 18–18–405, C.R.S.

(2012), Possession of a Schedule II Controlled Substance, section 18–18–403.5, C.R.S. (2012), and Possession of a Weapon by a Previous Offender, section 18–12–108, C.R.S. (2012).

6. While the court of appeals, at times, referenced Deputy Carroll's decision to move closer to the house's back door sometime after his initial entry, that court couched its holding only in terms of the unlawfulness of Deputy Carroll's initial entry, stating, "Defendant contends Deputy C's entry into the backyard was unlawful, and that it was the 'poisonous tree' that tainted all the incriminating evidentiary 'fruit' later discovered inside the house. We agree." *Brunsting*, 224 P.3d at 262.

¶ 13 Judge Connelly dissented. *Id.* (Connelly, J., dissenting). He opined that the prosecution demonstrated the reasonableness of the entry in light of the deputies' concern for officer safety, and he concluded that "[t]he officers reasonably decided the exigencies of this fast-developing situation required immediate action." *Id.* at 268.

¶ 14 We granted certiorari to consider "[w]hether the court of appeals erred in concluding that no exigent circumstances existed to justify the warrantless entry and search in this case."

## II.  Standard of Review

¶ 15 When we review a motion to suppress, we defer to a trial court's findings of fact and will not disturb those findings as long as they are supported by evidence in the record. *People v. Funez–Paiagua*, 2012 CO 37, ¶ 37, 276 P.3d 576, 578. We review de novo the trial court's ultimate legal conclusion of whether the officers violated the defendant's constitutional rights. *People v. Revoal*, 2012 CO 8, ¶ 9, 269 P.3d 1238, 1240.

## III.  Analysis

¶ 16 Both the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution prohibit "unreasonable searches and seizures." For purposes of appeal, the People have conceded that Deputy Carroll's actions constituted a search. Therefore, we consider only whether Deputy Carroll's actions are lawful under our case law, the case law of the United States Supreme Court, and Fourth Amendment principles generally. To that end, we begin by summarizing the principles of law that govern a warrantless search. Next, we consider whether the actions of law enforcement in this case were supported by probable cause. Then, we examine the exigency created when officer safety is placed in jeopardy, and we hold that officer safety concerns fall within the exigent circumstances exception when (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is

reasonable. Finally, we apply our test to the facts of this case.

## A.  The Lawfulness of a Search of a Residence's Curtilage

¶ 17 The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Likewise, the Colorado Constitution prohibits "unreasonable searches and seizures." Colo. Const. art II, § 7. The Fourth Amendment also states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person to be seized," and the Colorado Constitution echoes this requirement, *see* Colo. Const. art II, § 7. Hence, searches and seizures are limited by two constitutional principles: "all searches and seizures must be reasonable," and "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, —— U.S. ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011).

¶ 18 While these constitutional provisions lack an express requirement that a warrant is required in any given circumstance, it has become a bedrock principle of search and seizure jurisprudence that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). This presumption also attaches to the "area immediately surrounding and associated with the home," which cases have described as the "curtilage" of the home. *Florida v. Jardines*, —— U.S. ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013); *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Hoffman v. People*, 780 P.2d 471, 475–76 (Colo.1989).

¶ 19 This presumption, however, is not absolute. Because the "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the requirement that police obtain a warrant prior to a search of a residence's curtilage "is subject to certain reasonable exceptions." *See King*, 131

S.Ct. at 1856. The burden of overcoming this presumption rests with the People, who must show that the facts and circumstances surrounding the search constitute one of the exceptions to the warrant requirement. *People v. Boorem*, 519 P.2d 939, 940, 184 Colo. 233, 236 (1974).

¶ 20 In addition, we have required that police conducting a warrantless search adhere to the same requirements that would govern if police sought to obtain and execute a search warrant. *People v. Winpigler*, 8 P.3d 439, 444 (Colo.1999). Therefore, the facts and circumstances available to police at the time of the warrantless search are subject to the same probable cause inquiry as would have occurred had the officers applied for a search warrant. *Id.*

¶ 21 Hence, a warrantless search of a residence's curtilage is lawful where the search is supported by both probable cause and an exception to the warrant requirement. We examine each of these requirements as they apply to this case.

### B. Probable Cause

¶ 22 We first examine whether Deputy Carroll had probable cause to enter Brunsting's property. Probable cause is a flexible test measured by a commonsense, nontechnical standard of "reasonable cause to believe." *Winpigler*, 8 P.3d at 444–45. In order to establish probable cause in a search, officers must demonstrate reasonable grounds to believe that contraband or evidence of criminal activity was located in the area to be searched. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo.2006).

¶ 23 Here, Talent claimed that he owned the vehicle in the driveway and that it was stolen by someone named Lance. The owner of the house confirmed that a man named Lance lived in her basement. Deputy Carroll's independent investigation revealed that the speaker and stereo systems had been stripped from the vehicle. Taken together, these facts would lead a reasonable officer to believe that the van had been stolen. Although the deputies secured the van in the driveway, it was reasonable under these circumstances for the deputies to believe that

the person responsible for the van's theft, along with evidence of that crime, was located inside the residence or its curtilage. Accordingly, the officers had probable cause to enter the property.

### C. The Exigent Circumstances Exception

¶ 24 Having determined that the deputies had probable cause to enter the property, we next examine whether an exception to the warrant requirement applies.

¶ 25 Exigent circumstances constitute one possible exception. *See Winpigler*, 8 P.3d at 446. As the name suggests, exigent circumstances constitute an exception to the warrant requirement because, where these circumstances occur, the public's interest in a timely police response to emergent and fast-developing situations outweighs the individual's privacy interests. *See Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see also Winpigler*, 8 P.3d at 443.

¶ 26 We have identified three particular situations in which a warrantless search is reasonable in light of the exigent circumstances surrounding the search: when "(1) the police are engaged in 'hot pursuit' of a fleeing suspect; (2) there is a risk of immediate destruction of evidence; or (3) there is a colorable claim of emergency threatening the life or safety of another." *People v. Kluhsman*, 980 P.2d 529, 534 (Colo.1999). The People argue for a fourth category of exigent circumstances: an immediate danger to the lives of law enforcement officers. However, we see no need to create a fourth category. Instead, we examine Colorado and federal cases in order to determine whether a colorable claim of emergency threatening life or safety encompasses the situation in which the threat is to law enforcement officers.

¶ 27 We begin by noting that federal courts have not distinguished between a threat to the personal safety of law enforcement officers and a threat to others. The United States Supreme Court has stated that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency

or emergency." *Brigham City*, 547 U.S. at 403, 126 S.Ct. 1943; *Ryburn v. Huff*, —— U.S. ——, 132 S.Ct. 987, 990, 181 L.Ed.2d 966 (2012). In *Minnesota v. Olson*, the Court approved of a description of exigent circumstances that included a threat to law enforcement officers:

> [A] warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling.

495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (internal quotations and citations omitted). Likewise, in *Warden v. Hayden*, the Court upheld a warrantless search where the officers believed that their lives were in danger. 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

¶ 28 In addition, the Supreme Court has rebuffed attempts to restrict the exigent circumstances exception through the imposition of a subjective mental state inquiry, *see Brigham City*, 547 U.S. at 404, 126 S.Ct. 1943, or an inquiry as to whether the officers "manufactured" the exigency, *King*, 131 S.Ct. at 1859.[7] The Supreme Court has also rejected per se exceptions in favor of a "finely tuned" fact-based approach. *Missouri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 1559, 185 L.Ed.2d 696 (2013). This "totality of the circumstances" approach is intended to be malleable enough to address the "variety of circumstances [that] may give rise to an exigency sufficient to justify a warrantless search." *Id.* Taken as a whole, the Supreme Court's exigent circumstances cases favor a flexible exception that is measured by a fact-specific reasonableness inquiry and that covers a variety of emergency scenarios, including a risk to officer safety.

¶ 29 We turn to our cases that have considered the colorable claim of emergency exception. This "variant of the exigent circumstances exception requires a showing of an immediate crisis inside the home and the probability that police assistance will be helpful in alleviating that cri-

sis." *Winpigler*, 8 P.3d at 446 (citing *People v. Malczewski*, 744 P.2d 62, 66 (Colo.1987)). We have suggested that this exigency would be present where "the police are responding to an ongoing emergency inside a residence." *Aarness*, 150 P.3d at 1279. However, this statement did not mean that other situations would not fit within our colorable claim of emergency exception. *See, e.g., Winpigler*, 8 P.3d at 446 (examining threat to police officers under colorable claim of emergency exception). Instead, following the Supreme Court, we use a totality of the circumstances approach. *Id.*

¶ 30 To that end, we have endorsed a broad set of factors to determine whether a risk to officer safety creates exigent circumstances. Some of these factors assess whether the fear of danger is objectively reasonable. *See Aarness*, 150 P.3d at 1279 (employing such factors as "whether the suspect is believed to be armed"; "whether a grave offense is involved"; and "whether there is strong reason to believe the suspect is in the premises"); *Winpigler*, 8 P.3d at 446 (endorsing factor of "the risk posed to other persons from unnecessary delay"). Others address the reasonableness of the police response to the perceived risk. *Aarness*, 150 P.3d at 1279 ("whether the entry is made at night" and "whether the entry is made peaceably"); *Winpigler*, 8 P.3d at 446 ("the character of the investigation"). These factors are not exhaustive. Therefore, while courts faced with questions of exigent circumstances may use these factors to the extent they are helpful, the fundamental measure of the existence of exigent circumstances is an assessment of reasonableness based on the totality of the circumstances.

¶ 31 The reasonableness inquiry of this court and the United States Supreme Court is embodied by the approach taken by the Tenth Circuit Court of Appeals to exigencies created by a risk to personal safety. That court has used a two-part test: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to

---

7. The Supreme Court held that such an inquiry would be appropriate only "when the police ... gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *King*, 131 S.Ct. at 1862.

protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Storey v. Taylor,* 696 F.3d 987, 992–93 (10th Cir.2012); *United States v. Martin,* 613 F.3d 1295, 1304 (10th Cir.2010); *United States v. Walker,* 474 F.3d 1249, 1253 (10th Cir.2007); *United States v. Najar,* 451 F.3d 710, 718 (10th Cir.2006). Under this test, the colorable claim of emergency exception applies where there is an objectively reasonable risk and where law enforcement's response to that risk is reasonable. This test appropriately emphasizes the fundamental totality-of-the-circumstances reasonableness inquiry and clarifies that the scope of the colorable claim of emergency exception includes situations that federal courts have long considered within the scope of the exigent circumstances exception.

■■■ ¶ 32 Adopting the Tenth Circuit's approach, we hold that officer safety concerns fall within the exigent circumstances exception when (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable.

### 1. Objectively Reasonable Basis to Believe There Was an Immediate Risk to Safety

■■■ ¶ 33 The first part of our test examines whether law enforcement officers had an objectively reasonable basis to believe that their safety or the safety of others was at risk. We measure the objective reasonableness of this belief in the context of the totality of the circumstances, viewing them "as they would have appeared to a prudent and trained police officer at the time of the challenged entry." *Winpigler,* 8 P.3d at 446; *see also Storey,* 696 F.3d at 993.

¶ 34 Here, the deputies were informed that the defendant had a reputation as a dangerous person who was involved in illegal drugs and who was known to carry a weapon. As a result, a reasonable officer in the position of

these deputies would have believed that dangerous individuals were within the residence.

¶ 35 Moreover, the owner spoke louder than needed to convey her story to the deputies, and, as a result, Deputy Carroll expressed concerns that she would alert the other occupants to the deputies' presence. This concern was heightened when the deputies discovered security cameras on the house's exterior and was heightened further when attempts to reach the occupants by phone and by knocking on the front door failed to elicit a response.[8] These attempts potentially provided the occupants with advance warning of police presence.

¶ 36 Finally, these events occurred late in the evening, the house was lit only by a single light above its garage, and the front of the house was completely dark.

¶ 37 In summary, the deputies faced a dark house occupied by reportedly armed and dangerous individuals who potentially knew the deputies' positions and movements. Under these circumstances, the deputies had an objectively reasonable basis to fear for their safety, and Sergeant Dennis's decision to deploy his officers on both sides of the house was a reasonable precaution.

¶ 38 Consequently, when Sergeant Dennis deployed Deputy Carroll to protect the other officers from ambush from the house's western side, Deputy Carroll had limited options to deal with the presence of an additional security camera pointed at his position. In that instant, Deputy Carroll faced an unsafe situation with three potential solutions: (1) abandon his post, move away from the house toward the street, and leave Sergeant Dennis and others exposed to an ambush; (2) maintain his post, stand in the view of the camera, and risk his personal safety, a solution Deputy Carroll deemed "too dangerous"; or (3) enter the curtilage and hide. A prudent and trained officer faced with these narrow options, operating alone, in darkness, and under suspicion that armed individuals could be preparing an ambush, would believe that offi-

---

8. As the United States Supreme Court has said, "When the police knock on a door but the occupants choose not to respond or to speak, 'the investigation will have reached a conspicuously low point,' and the occupants 'will have the kind

of warning that even the most elaborate security system cannot provide.'" *King,* 131 S.Ct. at 1862 (quoting *United States v. Chambers,* 395 F.3d 563, 577 (6th Cir.2005) (Sutton, J., dissenting)).

cer safety was at risk. Under these circumstances, Deputy Carroll's concern for his immediate safety and the immediate safety of his fellow officers was objectively reasonable.

## 2. The Manner and Scope of the Search

¶ 39 In the second part of our test, we examine the reasonableness of law enforcement's response to the perceived danger. In this case, we granted certiorari to determine whether Deputy Carroll's entry into the curtilage was legal. We therefore limit our analysis of the scope and manner of the search to Deputy Carroll's act of crossing into the curtilage to hide. We look to our prior cases to determine the reasonableness of the manner and scope of this entry. In so doing, we again examine the totality of the circumstances surrounding the search, and we adhere to the principle that "[t]he fact that an intrusion is negligible is of central relevance to determining reasonableness." *Maryland v. King*, — U.S. ——, 133 S.Ct. 1958, 1969, 186 L.Ed.2d 1 (2013); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

¶ 40 In *Aarness*, we determined that a warrantless search of a residence was reasonable. 150 P.3d at 1280. In that case, officers had information that Aarness, the subject of an arrest warrant, was armed. *Id.* at 1274. In response to a tip, officers went to an apartment where they believed they could find Aarness. *Id.* When Aarness's brother opened the door in response to their knocks, the officers observed Aarness reach into the cushions of the recliner where he was sitting. *Id.* Officers believed that Aarness might be reaching for a weapon. *Id.* In response, the officers ordered the other occupants out of the apartment, entered the apartment with guns drawn, and conducted a protective sweep of the apartment, including the bedrooms. *Id.* To analyze whether that search was constitutional, we examined the reasonableness of the entry by looking at such factors as "whether the entry was made at night" and "whether the entry was made peaceably." *Id.* at 1279. We concluded that

both the intrusion caused by the command to the occupants and the intrusion caused by the protective sweep of the residence were reasonable in light of officer safety concerns. *Id.* Thus, under the circumstances of that case, we held that the search passed constitutional muster, and we reversed the suppression order. *See id.*

¶ 41 Similarly, we examined the reasonableness of police action in *People v. Smith*, 13 P.3d 300 (Colo.2000).[9] In that case, police were conducting a roadside stop when a second vehicle pulled up behind the patrol car and disrupted the traffic stop. *Id.* at 303. The driver of the second vehicle left its headlights on, which prevented the patrol officer from determining the number of occupants, their positions, or their movements. *Id.* As a result of growing concern for his personal safety, the patrol officer approached the second vehicle with his gun drawn, ordered the occupants out of the vehicle, and detained the occupants in handcuffs. *Id.* at 303–04. We determined that the officer's actions, including the use of handcuffs, were reasonable. *Id.* at 306. We held that while such intrusions are not normally acceptable, they are "justified when the circumstances indicate that such force constitutes a reasonable precaution for the protection and safety of the investigating officers." *Id.* at 305.

¶ 42 Conversely, in *Winpigler*, we upheld the suppression of evidence obtained as a result of a warrantless search by police officers in response to a perceived threat to their safety. 8 P.3d at 446. In that case, officers waiting near a residence's front doorway became concerned for their safety when they observed swords hanging from a wall within the residence. *Id.* As a result, the officers entered and searched the residence without a warrant. *Id.* We stressed that part of the reasonableness of law enforcement's response to a perceived danger is whether officers readily could have obtained a warrant without further compromising their safety. *See id.* Hence, we agreed with the trial court's finding that the officers could

9. We recognize that *Smith* did not require an analysis of the exigent circumstances exception to the warrant requirement. *See* 13 P.3d at 303–06. However, in *Smith*, we analyzed the reason-ableness of police conduct in response to officer safety concerns. *Id.* Accordingly, *Smith's* discussion of reasonable police conduct is helpful to our analysis of our test's second prong.

have eliminated the threat from the swords by detaining the home's occupants and then obtaining a warrant to search the residence. *Id.* Therefore, we affirmed the trial court's suppression order. *Id.*

¶ 43 Comparing these cases to the instant case, we draw two conclusions. First, the entry into Brunsting's curtilage, the search in *Aarness,* and the search in *Smith* each occurred in response to situations in which law enforcement officers were confronted with a threat of potentially armed individuals amid uncertain and rapidly developing circumstances. In *Aarness,* the police were uncertain as to whether Aarness was armed and had moments to react to his motion toward the couch cushions. In *Smith,* the patrol officer could not see the unidentified vehicle's occupants and could not ascertain their intentions. Likewise, in this case, police did not know the positions or intentions of the residence's reportedly armed occupants. Further, the trial court found that the deputies did not have time to withdraw and obtain a warrant without compromising the safety of the reporting party. This case, *Aarness,* and *Smith* thus presented safety concerns of similar uncertainty that did not present a ready solution. In contrast, the officers in *Winpigler* had a clear view of the swords, did not see anyone approach the swords, and could have eliminated the threat by detaining the residence's occupants. Hence, *Winpigler* is distinguishable from the instant case.

¶ 44 Second, the officers in *Aarness* entered the defendant's home with their guns drawn. They pulled the occupants out of the home, detained them, and searched the entire home, including bedrooms. In *Smith,* police ordered occupants out of their vehicle at gunpoint and placed them in physical restraints. In this case, Deputy Carroll walked a few feet through an open gate and hid in a bush in Brunsting's backyard. Comparing the police reactions in *Aarness* and *Smith,* both of which we determined to be reasonable, with Deputy Carroll's reaction in this case, the objectively reasonable concern for officer safety justified the minimal intrusion. Accordingly, the search was reasonable in manner and scope.

¶ 45 In sum, Deputy Carroll's entrance into Brunsting's curtilage was motivated by an objectively reasonable concern for the immediate safety of himself and others. Furthermore, the manner and scope of Deputy Carroll's search was reasonable. Hence, we conclude that Deputy Carroll acted in conformity with the exigent circumstances exception.

## IV. Conclusion

¶ 46 We hold that officer safety concerns fall within the exigent circumstances exception when (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable. We conclude that Deputy Carroll's initial entry into Brunsting's curtilage was justified by the exigent circumstances exception. Accordingly, we reverse the judgment of the court of appeals. We remand to that court to consider the remainder of the issues raised on appeal concerning the conduct by law enforcement that occurred after Deputy Carroll crossed into the defendant's curtilage and to consider all other outstanding issues.