JUSTICE SAMOUR delivered the Opinion of the Court.
*275 ¶1 The People brought this interlocutory appeal pursuant to section 16-12-102(2), C.R.S. (2017), and C.A.R. 4.1, seeking review of the trial court's order suppressing evidence of two laser-sight rifles seized during a warrantless search of defendant Michael Pappan's residence. We now reverse the trial court's suppression order. We hold that the officers' warrantless search was justified by exigent circumstances. More specifically, we conclude: (1) that the officers had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety, and (2) that the manner and scope of the search was reasonable. We further hold that the warrantless seizure of the laser-sight rifles was justified by the plain view doctrine.
I. Facts and Procedural History
¶2 Around 6:40 in the evening, an individual called 911 to report that he observed a man in the green house directly across the street pointing a laser-sight rifle at him. Apparently scared for his safety, after requesting assistance, the 911 caller left his residence in his car and parked nearby. Trinidad Police Department officers responded to the call shortly thereafter. Officer De La Fuente, among the first officers on scene, testified that she was familiar with the neighborhood and was aware that the 911 report was consistent with the types of crimes that are common in that area.
¶3 Upon arriving, the officers observed that a female standing on the front porch of the green house avoided them by immediately going inside the house and locking the screen door behind her, despite their commands to stop and their requests to talk to her. Officer De La Fuente followed her and tugged on the screen door to open it; she then asked the female to come outside and pulled her out to the porch. While standing just inside the doorway, Officer De La Fuente noticed a male, later identified as Pappan, running down the stairs from the second floor; he was yelling as he asked questions and made comments. The officer asked him to come out to the porch as well, and he did so. Because he disregarded another officer's commands while on the porch, he was placed in handcuffs and detained. Based on information the officers received from the female, they next called out for a child to come out of the house. A child exited, but only after multiple requests by the officers.
¶4 The atmosphere on the porch was chaotic. Further, none of the parties the officers had contacted had the laser-sight rifle referenced by the 911 caller, and the officers had not yet identified a suspect or obtained reliable information about whether there were other parties inside the residence.[1] Concerned for their safety, the officers "cleared" the house for other occupants. They made a peaceable entry into the house, albeit with their guns drawn. Inside, in an upstairs room, they saw in plain view and collected two laser-sight rifles. No other individuals were found in the house.
¶5 Pappan was subsequently charged with felony menacing, reckless endangerment, and disorderly conduct. Following a pretrial hearing, the trial court granted Pappan's motion to suppress evidence obtained during the search of his home, finding that "it would have been better practice for the police to obtain a search warrant." The People then filed this interlocutory appeal.
II. Standard of Review
¶6 In reviewing an order addressing a motion to suppress evidence, we defer to the factual findings made by the trial court. People v. Funez-Paiagua, 2012 CO 37, ¶ 6, 276 P.3d 576, 578. So long as the trial court's factual findings are supported by competent evidence, we will not disturb them. Id. However, our review of the trial court's legal conclusions vis-à-vis the constitutionality *276 of the challenged search and seizure is de novo. Id.; see also People v. Syrie, 101 P.3d 219, 222 (Colo. 2004) ("The legal conclusions of the trial court are subject to de novo review and reversal [is required] if the court applied an erroneous legal standard or came to a conclusion of constitutional law that is inconsistent with or unsupported by the factual findings.").
III. Analysis
¶7 The People argue that the trial court erred in granting Pappan's motion to suppress because the exigent circumstances present, in conjunction with the plain view doctrine, justified the officers' warrantless search and seizure. We agree.[2]
A. Relevant Law
¶8 The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit "all unreasonable searches and seizures." Mendez v. People, 986 P.2d 275, 279 (Colo. 1999). Although neither constitutional provision specifies when law enforcement must obtain a warrant before conducting a search, the United States Supreme Court has inferred from the text of the Fourth Amendment that "a warrant must generally be secured." Kentucky v. King, 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). It is now "a bedrock principle ... that 'searches and seizures inside a home without a warrant are presumptively unreasonable.' " People v. Brunsting, 2013 CO 55, ¶ 18, 307 P.3d 1073, 1078 (quoting King, 563 U.S. at 459, 131 S.Ct. 1849 ). But this presumption may be overcome in some situations. Id. at ¶ 19, 307 P.3d at 1078-79. Because the "ultimate touchstone" of search and seizure jurisprudence is reasonableness, there are certain exceptions to the warrant requirement. King, 563 U.S. at 459, 131 S.Ct. 1849 (quoting Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ). When police officers conduct a warrantless search, the People bear the burden of establishing that the search "is supported by probable cause and is justified under one of the narrowly defined exceptions to the warrant requirement." People v. Winpigler, 8 P.3d 439, 443 (Colo. 1999).
¶9 Pappan concedes that the People made "a clear showing of probable cause," and the record shows that the officers had probable cause to believe that a crime had been committed and that evidence of that crime, namely a laser-sight rifle, would be located in his residence. The parties disagree, however, on whether the People met their burden of demonstrating both that the exigent circumstances exception justified the warrantless search of Pappan's residence, and that the plain view exception justified the warrantless seizure of the two laser-sight rifles.
¶10 We have repeatedly acknowledged that there is an exception to the warrant requirement "when exigent circumstances exist that necessitate immediate police action." Id.; see also Brunsting, ¶ 25, 307 P.3d at 1079 (when exigent circumstances are present, "the public's interest in a timely police response ... outweighs the individual's privacy interests."). In Brunsting, we held that "officer safety concerns fall within the exigent circumstances exception when (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." Brunsting, ¶ 32, 307 P.3d at 1081. In applying the first part of this test, we considered "the totality of the circumstances ... 'as they would have appeared to a prudent and trained police officer at the time of the challenged entry.' " Id. at ¶ 33, 307 P.3d at 1081 (quoting Winpigler, 8 P.3d at 446 ). The second part of the test required us to focus on the totality of the circumstances surrounding the search actually conducted. Id. at ¶ 39, 307 P.3d at 1082.
¶11 Another well-established exception to the warrant requirement is the plain view doctrine, which provides that police officers "are not required to close their eyes to any evidence that they plainly see *277 while conducting otherwise legitimate searches." People v. Gothard, 185 P.3d 180, 183 (Colo. 2008) (quoting People v. Pitts, 13 P.3d 1218, 1222 (Colo. 2000) ). There are three requirements to the plain view doctrine: (1) the intrusion must have been legitimate; (2) the officers must have had a reasonable belief that the evidence seized was incriminating; and (3) the officers must have had a lawful right of access to the evidence. Id. The first prong is met when probable cause and exigent circumstances justify the officers' presence. Id. at 183-84. "The second prong exists when police have probable cause to believe the evidence is incriminating, and the incriminating nature is immediately apparent" to the officers. Id. at 184. "As with other exceptions to the warrant requirement, the exigent circumstances exception may combine with the plain view doctrine to justify a warrantless search and seizure." People v. Kluhsman, 980 P.2d 529, 535 (Colo. 1999).
B. Application
1. Exigent Circumstances Exception
¶12 Based on the evidence presented at the hearing, we conclude that when the officers entered Pappan's residence, they had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety. We further conclude that the evidence introduced at the hearing established that the manner and scope of the warrantless search was reasonable. Therefore, we hold that the People satisfied Brunsting's two-part test for application of the exigent circumstances exception when officer safety concerns are implicated.
a. The Officers Had an Objectively Reasonable Basis to Believe There Was an Immediate Need to Protect Their Lives or Safety
¶13 In determining that the officers had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety, we consider the totality of the circumstances. However, we view the circumstances as a prudent and trained officer would have at the time of the search.
¶14 It was close to night time when the officers responded to Pappan's house pursuant to a 911 call. A man in Pappan's residence had reportedly pointed a laser-sight rifle at the neighbor who lived in the house across the street. The neighbor was sufficiently concerned for his safety that after calling 911 he drove away from his residence in his car and parked nearby. The officers were aware that the 911 report was consistent with the types of crimes that are common in that area.
¶15 The first person the officers encountered, a female on the front porch of Pappan's house, immediately avoided them by going inside the house and locking the screen door behind her, despite their commands to stop and their requests to talk to her. Officer De La Fuente had to yank the screen door open and pull her out to get her on the porch. Moments later, Officer De La Fuente saw Pappan running down the stairs from the second floor of the residence and heard that he was yelling. Although he complied with her request to come out to the porch, he subsequently disregarded another officer's commands. As a result, the officers placed him in handcuffs and detained him. The officers then had to call for a child to come out of the house multiple times before the child finally exited. At the hearing, Officer De La Fuente described the situation as chaotic.
¶16 Importantly, the officers realized that none of the individuals on the porch were in possession of a laser-sight rifle or any type of firearm. Consequently, they had a reasonable basis to believe that the laser-sight rifle the 911 caller complained about was still in Pappan's house. Moreover, the officers did not yet know whether the perpetrator who pointed the laser-sight rifle at the 911 caller remained in the house. Nor did the officers have reliable information as to whether there were other individuals in the house, including on the second floor. And, because the officers had a difficult time locating the 911 caller, he was not available to provide additional information to them at that time.
¶17 Under the totality of the circumstances, as they would have appeared to a prudent and trained officer, Officer De La Fuente and her fellow officers faced a serious *278 risk to their lives or safety that understandably caused them concern. While standing on the front porch of Pappan's house, the officers were vulnerable to being ambushed by an individual in the house with access to the laser-sight rifle reportedly on the premises. Therefore, they had objectively reasonable grounds to believe there was an immediate need to protect themselves. The threat they faced was real, and the fear they felt was objectively reasonable. Ignoring the situation they confronted would have imperiled their safety.
¶18 Pappan nevertheless argues that the officers' concern for their safety did not justify clearing his residence for other occupants because they had already concluded he was the individual who reportedly pointed a laser-sight rifle at the 911 caller. However, the trial court did not make a finding as to when, in relation to the search conducted, the officers identified the male detained on the porch as the suspect.[3] Further, the dispatch CD, which contains the 19 audio-recorded communications dispatch had with the 911 caller and the responding officers, suggests that the officers identified the male on the porch as the suspect after they cleared the house and learned that there were no other male occupants present.[4] Immediately after the officers informed dispatch that they were going to clear Pappan's residence for other occupants, there were no communications with dispatch for a handful of minutes. This radio silence is consistent with the officers clearing Pappan's residence for other occupants. During the next radio communication by the officers who cleared the house, they informed dispatch for the first time that the male on the porch, Pappan, was the suspect who allegedly pointed a laser-sight rifle at the 911 caller.
¶19 In any event, Pappan's contention is inconsequential. Even if the officers had known before the search that the male detained on the porch was the suspect, their actions still would have been justified because there could have been other parties in the residence and the laser-sight rifle had not yet been located. The threat would have been just as real, and the officers' concern for their lives or safety would have been just as objectively reasonable. Thus, contrary to Pappan's assertion, application of the exigent circumstances exception in this case does not hinge on whether the officers identified the male on the porch as the suspect before or after conducting their search.
¶20 We recognize that Pappan and the female indicated to the officers before the search that there were no other occupants in the house. But the officers were not required to rely on that information or to accept it as accurate. Both Pappan and the female had refused to heed the officers' commands and had been less than cooperative. Additionally, the possibility existed that Pappan, as a male, would later be identified as the suspect. Moreover, as Officer De La Fuente testified, she typically assumes that people are lying to her because it is not uncommon for people to lie to police officers.[5]
¶21 The trial court acknowledged Officer De La Fuente's testimony that the officers did not know when they conducted the search whether there were other people in *279 the house. However, it pointed out that the officers "did not search the basement." This observation is of no import to our analysis. First, the trial court did not find incredible Officer De La Fuente's testimony that she and her fellow officers entered the house for officer safety reasons. Nor did the trial court question Officer De La Fuente's general credibility. Second, the dispatch CD corroborates Officer De La Fuente's testimony. The CD reflects that the officers informed dispatch that they were going to clear the house to make sure no one else was inside. Finally, we decline Pappan's invitation to speculate that the officers' failure to check the basement reflects they were not genuinely concerned about their safety and were, instead, looking for an excuse to search the house for evidence. Once the two laser-sight rifles were located and collected, the officers may reasonably have concluded there was no need to check the basement because any threat to their safety had been neutralized. It is equally plausible that the officers viewed the basement as an area of the house that posed no imminent threat to their safety, especially since they had not observed anyone walk upstairs from the basement.
¶22 That there were officers stationed around Pappan's residence at the time of the search does not alter our analysis either. This circumstance did not affect the threat to the officers or their concern for their safety. To be sure, Officer De La Fuente testified that at least one officer had a visual on each exit of the residence. But the fact remains that the officers had probable cause to believe there was a laser-sight rifle inside the residence that may have been accessible to an unknown individual. Having a visual on all the exits of the residence did not protect the officers from someone armed with a rifle lying in wait.
¶23 In sum, we find that the People demonstrated at the hearing that the officers had objectively reasonable grounds to believe that they had an immediate need to protect their lives or safety. We therefore proceed to explore the reasonableness of the officers' response to the perceived danger.
b. The Manner and Scope of the Warrantless Search was Reasonable
¶24 When we assess whether the manner and scope of a warrantless search was reasonable, we again look at the totality of the circumstances. Here, though, our focus is on the circumstances surrounding the search conducted.
¶25 We begin this part of our analysis, as we did in Brunsting, by drawing guidance from our decision in People v. Aarness, 150 P.3d 1271 (Colo. 2006). In Aarness, police officers received an anonymous tip indicating that Aarness had outstanding warrants for his arrest. Id. at 1274. The same tip included Aarness's height, weight, hair color, and eye color, and reported that Aarness was armed with a loaded handgun. Id. After verifying the existence of the outstanding warrants, six officers responded to Aarness's apartment. Id. Three of them knocked on the door with their guns drawn. Id. When Aarness's brother opened the door, the officers saw Aarness sitting in a recliner. Id. Because Aarness immediately shoved his hand between the cushion and the armrest of the recliner, the officers believed he was reaching for a weapon and ordered him to show his hands. Id. Concerned for their safety, the officers pulled Aarness's brother out of the apartment and ordered two other individuals to exit the apartment. Id. A few seconds later, Aarness complied with the officers' order to raise his hands. Id. The officers nevertheless entered the apartment with guns drawn, arrested Aarness, and cleared the apartment for other occupants. Id.
¶26 We concluded that the manner and scope of the officers' entry to arrest Aarness and clear the apartment was reasonable in light of the officer safety concerns present. Id. at 1279-80. In so doing, we considered, among other factors, "whether the entry [was] made peaceably" and "[w]hether the entry [was] made at night." Id. at 1279.
¶27 In Brunsting, we also relied on People v. Smith, 13 P.3d 300 (Colo. 2000), and Smith is equally instructive here. There, a police officer conducted a traffic stop shortly before 3:00 a.m. for driving with an obstructed windshield. Id. at 303. After the driver handed *280 him her license and informed him she did not have registration paperwork because the vehicle she was driving belonged to a friend, the officer returned to his patrol car and ran checks on the license plate number of the vehicle and on the vehicle identification number. Id. The latter check revealed that the vehicle was stolen. Id. While in his patrol car, the officer noticed that the driver made a call using a cell phone. Id. A Suburban with tinted windows then pulled up behind the officer's patrol car. Id. Because the driver of the Suburban, Smith, left his headlights on, the officer could not determine how many people were in that vehicle. Id. Concerned for his safety and fearing "an ambush," the officer called for backup. Id. Another officer responded within two to five minutes, and the two officers approached the Suburban with their guns drawn and ordered Smith to turn off the ignition and drop his keys outside his window. Id. He complied. Id. After additional backup arrived, the officers yelled at Smith to exit his vehicle slowly with his hands in the air. Id. at 303-04. Once out of the Suburban, the officers ordered Smith to turn around so they could conduct a visual search for weapons, ordered him into a kneeling position with his hands behind his head, commanded him to lie prone, handcuffed him, and took him into custody. Id. at 304.
¶28 Because a subsequent search of the Suburban yielded a loaded handgun and crack cocaine, Smith was charged with several drug and weapon offenses. Id. In reversing the trial court's order granting Smith's pretrial motion to suppress, we examined the totality of the circumstances and ruled that "it was clearly reasonable for the officers to believe that the occupant(s) of the Suburban could pose a threat to their safety." Id. at 305. We therefore concluded that the officers "were entitled to order Smith out of the car, and conduct a protective search for weapons." Id. Significantly, although we acknowledged that the officers' intrusions were unconventional, we reasoned that they were justified based on the circumstances, which reflected that the force used constituted a reasonable precaution necessary for the protection and safety of the officers:
The degree of force that the officers used was significant, but was not disproportionate to the circumstances in which they found themselves. The officers' display of weapons and means of detaining Smith were legitimate safety precautions taken in response to the uncertain danger posed by the Suburban's occupant(s). The officers were entitled to use some force until they secured the situation, were able to ascertain Smith's identity, whether he was armed, and the reasons for his presence at the scene.
Id. at 305-06.
¶29 Here, contrary to the general rule governing searches and seizures, the officers searched Pappan's home without obtaining a warrant. But the warrantless search was justified by the circumstances, which reflected that the officers needed to take immediate action to protect themselves. As they stood on the porch of Pappan's home, the officers were as vulnerable as the arresting officers were in Aarness when they saw Aarness shove his hand between the cushion and the armrest of his recliner, and as vulnerable as the first responding officer was in Smith when the Suburban pulled up behind his patrol car. Officer De La Fuente and her fellow officers reasonably feared that they would be ambushed by an unknown individual inside the house with access to the laser-sight rifle believed to be on the premises.
¶30 Given the seriousness of the imminent threat present, the manner and scope of the officers' search was reasonable. The search was protective in nature and was narrowly tailored to neutralize the threat confronting the officers. The officers entered the house peaceably, albeit with their guns drawn, to clear the house for other occupants. They walked through the first two floors of the house strictly to check for people. There was no way for the officers to protect themselves from the danger they faced other than to do a walk-through inside the house to determine whether anyone else was there. And, after securing the two laser-sight rifles and ensuring there were no other occupants in the house, the search ended.
¶31 Considering the totality of the circumstances, we are convinced that the manner *281 and scope of the officers' search was reasonable. Hence, we find that the People met the second element of the test we set forth in Brunsting.
2. Plain View Exception
¶32 Having determined that the officers' safety concerns fell within the exigent circumstances exception to the warrant requirement, we next address whether the seizure of the two laser-sight rifles was justified. Based on the plain view doctrine, we conclude that it was.
¶33 Because we have already found that probable cause and exigent circumstances justified the officers' entry into Pappan's residence, the first prong of the plain view doctrine, which requires that the intrusion be legitimate, was met. The remaining two prongs were likewise satisfied. First, when the officers saw the laser-sight rifles, they had probable cause to believe that the rifles constituted incriminating evidence because the 911 caller had reported that the firearm pointed at him was a laser-sight rifle. Under the circumstances, the incriminating nature of the rifles was also immediately apparent to the officers.[6] Second, the officers had a lawful right of access to the laser-sight rifles because they were conducting a legitimate search and were not required to close their eyes to incriminating evidence that was plainly visible.
¶34 In short, the plain view doctrine authorized the officers to seize the two laser-sight rifles without a warrant. Therefore, the warrantless seizure did not violate the Fourth Amendment to the United States Constitution or article II, section 7 of the Colorado Constitution.
IV. Conclusion
¶35 We hold that the trial court erred in finding that the officers violated Pappan's constitutional right to be free from unreasonable searches and seizures. Therefore, we reverse the trial court's suppression order and remand the case for further proceedings.
JUSTICE GABRIEL dissents, and JUSTICE HART joins in the dissent.

The officers had a difficult time locating the 911 caller and did not speak with him until later in their investigation.

Pappan's motion did not challenge, and the trial court did not address, the legality of Officer De La Fuente's initial entry just inside the doorway of Pappan's residence to pull the female out to the porch. We limit our analysis accordingly.

The trial court found that "it was clear on the dispatch tape that the reporting party unequivocally stated it was Mr. Pappan with the firearm," and that dispatch communicated this information to at least one unknown officer at some unknown time. But the trial court did not find that this information was provided to the responding officers before they cleared Pappan's residence for other occupants, and the record would not have supported such a finding.

Officer De La Fuente testified on cross-examination that when Pappan came down the stairs, she realized that his gender fit the perpetrator's gender. Pappan's gender, though, could not rule out the potential that a different male was the perpetrator. It was only after the officers cleared the house and discovered there were no other males present that Pappan could be singled out as the suspect.

This opinion should not be misinterpreted as establishing exigent circumstances to clear a residence without a warrant whenever police officers assume a resident is lying to them about whether there are other occupants inside. Rather, we simply conclude that where, as here, there is an objectively reasonable basis to believe police officers have an immediate need to clear a residence for occupants in order to protect their lives or safety, they are not required to accept as true a representation by a resident that there is no one else inside.

The officers did not seize the third firearm located in Pappan's residence. Because that firearm was not consistent with the rifle described by the 911 caller, the officers lacked probable cause to believe it constituted incriminating evidence. Nor was the incriminating nature of the unrecovered firearm immediately apparent to the officers.