**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Terry SMITH, Defendant–Appellee.**

**No. 00SA47.**

Supreme Court of Colorado, En Banc.

Sept. 11, 2000.

A. William Ritter, Jr., District Attorney, Henry R. Reeve, Deputy District Attorney, Denver, Colorado, Attorneys for Plaintiff–Appellant

Scheitler & Elio, P.C., Frank I. Scheitler, Denver, Colorado, Attorneys for Defendant–Appellee

Justice KOURLIS delivered the Opinion of the Court.

In this interlocutory appeal, the State challenges a suppression order of the trial court. The trial court held that the amount of force used by police during a traffic stop escalated the encounter into an arrest, which was not supported by probable cause. Therefore, the trial court suppressed the evidence obtained from a search of the defendant's vehicle.

We disagree with the trial court's conclusions of law. Although the police did display force, their conduct was not unreasonable in light of the circumstances the officers faced. Accordingly, we characterize this police-citizen encounter as an investigatory stop rather than an arrest. We further find that the investigatory stop met the reasonableness standards of the Fourth Amendment. As part of the stop, the police were entitled to conduct a protective search of Smith's vehicle, and the evidence at issue is admissible under the plain view doctrine. Accordingly,

we reverse the trial court's suppression order.

## I.

At 2:50 a.m. on March 15, 1999, Denver police officer Jones stopped a Jeep Cherokee on I–70 for a windshield obstruction violation. Jones was on solo patrol at the time. He approached the car and asked the driver and the lone occupant, Natalie Williams, for her license and vehicle registration. Williams handed the officer her license, but told him that since the car belonged to a friend, she did not have registration paperwork. Officer Jones returned to his vehicle and ran a computer check on the license plate number of the vehicle, which did not reveal any problems. However, the officer then ran a computer search on the vehicle identification number (VIN) for the Jeep and discovered that the Jeep was on record as having been stolen.

While Officer Jones was running the computer searches, he observed Williams make a call in her vehicle from a cellular phone. Shortly thereafter, a GMC Suburban with tinted windows pulled up behind Officer Jones's patrol car. The Suburban stopped one to one-half car lengths behind the officer's vehicle, and the driver left the headlights on. According to Jones, because of the headlights and the time of night, he could not see into the Suburban. Therefore, he could not determine how many people were in the vehicle. Jones testified that the Suburban's presence alarmed him, and that he feared an ambush. He also testified that in his eight years experience, no other car had pulled up directly behind him during a traffic stop. As a result, Jones radioed for backup. A second officer, Sergeant Rodarte, arrived within two to five minutes.

The defendant, Terry Smith, was the driver of the Suburban. When Rodarte arrived, Rodarte and Jones approached Smith with their guns drawn, and Rodarte yelled "forcefully and directly" at Smith to turn off the ignition and drop his keys out the window. Smith complied. During this exchange, two other officers arrived at the scene and approached Smith's vehicle.[1] Rodarte then

---

1. Sergeant Rodarte initially testified that he was not sure whether the other officers had their

yelled at Smith to exit the vehicle slowly keeping his hands in the air. Rodarte ordered Smith to turn around so that the officers could do a visual search for weapons. He then ordered Smith into a kneeling position with his hands behind his head. The officers commanded Smith to lie prone, handcuffed him, and took him into custody for the crime of interference with police authority, in violation of a Denver municipal ordinance. At that point, the officers reholstered their weapons. The officers stood Smith up, conducted a pat down search, and asked permission to search the Suburban, to which Smith consented. At no point after arriving at the scene did Smith make any movements or attempt to get out of the car until told to do so by the officers. Smith neither resisted the officers nor failed to comply with any of their commands.

The officers testified that they would have searched Smith's vehicle, even without his consent, under their search incident to arrest authority. The search of the Suburban revealed a loaded handgun in the center console and a substance that appeared to be crack cocaine in the overhead console.[2]

The State charged Smith with four counts: (1) possession with intent to distribute a controlled substance; (2) possession of a controlled substance schedule II; (3) possession of twenty-five grams or more of a controlled substance schedule II; and (4) special offender, controlled substance, deadly weapon.

Smith filed a motion to suppress. The trial court granted the motion finding that the officers' conduct amounted to an arrest without probable cause because there was no evidence that Smith had indeed interfered with the officers' conduct. In so holding, the court analyzed objective evidence of interference, not the subjective belief of Officer Jones. The court then examined whether the officers had conducted an investigatory stop, and concluded that they had not. The

court found that the officers had used more force than was necessary under the totality of the circumstances, and that the use of such force converted the stop into an arrest. Because the officers arrested Smith without probable cause and searched his vehicle without his valid consent, the trial judge suppressed the evidence found in the Suburban.

The State then filed this interlocutory appeal challenging the trial judge's legal conclusion that this police-citizen encounter constituted an arrest.[3]

## II.

We must first determine whether the police contact with Smith amounted to an arrest or an investigatory stop. We hold that under these circumstances, this police-citizen encounter is properly characterized as an investigatory stop despite the show of force and resulting seizure.

▮ Whether an encounter is an arrest or an investigatory stop is a mixed question of law and fact. We defer to the trial court's findings of fact, but undertake de novo review of the trial court's legal conclusions. *See People v. Arroya*, 988 P.2d 1124, 1129 (Colo.1999).

▮ On the spectrum of police-citizen encounters, which range from a full-scale arrest or search to a consensual encounter, an investigatory stop falls in the middle. *See People v. Archuleta*, 980 P.2d 509, 512 (Colo. 1999). Because an investigatory stop is an "intermediate" level of police response, it may be employed in "narrowly defined circumstances upon less than probable cause." *Id.* The less exacting standard of "reasonable suspicion" applies, allowing officers to stop suspects and question them or to conduct a pat down for weapons. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971).

---

weapons drawn at this point, but Rodarte's testimony later indicated that at least one of the officers had a weapon drawn during this period.

**2.** The officers' written reports indicated that the center console had a small door, but that the door was open so that the handgun was in plain view to the officers. The overhead console was

enclosed with a small door, which the officers opened to find the cocaine.

**3.** The State does not challenge the findings of fact made by the district court, and we accept these findings in full.

■ Because roadside encounters between police and suspects are recognized as being especially hazardous, when police conduct an investigatory stop in the context of a traffic stop, an officer may order the driver or passengers out of the automobile and conduct a protective search of the passenger compartment of the vehicle for weapons as long as the officer possesses a reasonable belief that the occupants pose a danger. *See Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). "Such a limited intrusion is viewed as a reasonably effective method of neutralizing the risk of physical harm confronting the officer." *People v. Melgosa,* 753 P.2d 221, 225–26 (Colo.1988).

■ Furthermore, during an investigatory stop, an officer may take steps to ensure his own safety. *See Archuleta,* 980 P.2d at 513. This means that an officer may take physical control of or seize a suspect. *See Long,* 463 U.S. at 1051, 103 S.Ct. 3469. An officer may use force in detaining a suspect, and the fact that some force is used does not necessarily convert the police-citizen encounter into an arrest. *See People v. Breidenbach,* 875 P.2d 879, 887 (Colo.1994). Even the use of handcuffs does not automatically transform a detention into an arrest. *See People v. Bland,* 884 P.2d 312, 322 (Colo. 1994). Generally, "the trend developing since *Terry* has been to include within the rubric of investigatory stops in some circumstances 'the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.'" *Archuleta,* 980 P.2d at 513 (quoting *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994)).

In *Archuleta,* this court characterized a police-citizen encounter as an investigatory stop rather than an arrest when a police officer followed a fleeing suspect into a restaurant where the suspect was hiding, the officer drew his gun, and interrogated the suspect with his weapon still drawn. *See* 980 P.2d at 513. We held that the officer's use of his weapon did not constitute an arrest, but rather was a justifiable safety precaution under the circumstances. *See id.*

■ ■ While we have found that physical restraint, the use of handcuffs, the drawing of weapons, and other demonstrations of force do not necessarily convert an investigatory stop into an arrest, such show of force does heighten our concern as to whether the action taken exceeds what is reasonably necessary. Moreover, the use of such force is a far greater level of intrusion. *See United States v. Melendez–Garcia,* 28 F.3d 1046, 1052 (10th Cir.1994). The use of physical restraint, handcuffs, and weapons in the same stop is only justified when the circumstances indicate that such force constitutes a "reasonable precaution for the protection and safety of the investigating officers." *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(d) at 37 (3d ed.1996).

In this case, it was reasonable for the officers to be suspicious about the motive and intent of the driver of the Suburban. The officer had discovered that Williams was driving a stolen vehicle; it was nearly 3:00 a.m. and no one else was present; Smith arrived after the suspect in the stolen vehicle placed a phone call; and the Suburban pulled directly behind Officer Jones and left the headlights illuminated such that Jones could not see into the Suburban. Under all of these circumstances, it was clearly reasonable for the officers to believe that the occupant(s) of the Suburban could pose a threat to their safety. Therefore, Officer Jones and the other officers were entitled to order Smith out of the car, and conduct a protective search for weapons.[4]

The degree of force that the officers used was significant, but was not disproportionate to the circumstances in which they found

---

4. While the unexpressed subjective feelings of the officers do not in themselves play any role in determining whether the incident constitutes a stop or an arrest, they may be relevant to the extent that they reflect on what the officers' demeanor, attitude, and actions may have been towards the suspects since these attributes would have mirrored the officers' state of mind and may have affected the suspect's perception of the extent of confinement. *See United States v. Richard,* 732 F.Supp. 656, 662 n. 4 (W.D.Va.1990). Here, although the officers testified that they had a subjective intent at the time to arrest Smith, any effect their intent may have had is outweighed by the paramount concerns for officer safety under these facts.

themselves. The officers' display of weapons and means of detaining Smith were legitimate safety precautions taken in response to the uncertain danger posed by the Suburban's occupant(s). The officers were entitled to use some force until they secured the situation, were able to ascertain Smith's identity, whether he was armed, and the reasons for his presence at the scene. Accordingly, we hold that the trial court erred in determining that the officers' use of force transformed the stop into an arrest.

## III.

Having concluded that the officers conducted an investigatory stop rather than an arrest, the court must determine whether that stop was constitutionally permissible. Although investigatory stops may be conducted upon less than probable cause, they are still subject to the reasonableness requirements of the Fourth Amendment. *See Archuleta*, 980 P.2d at 512. An investigatory stop meets constitutional standards if: (1) the officer conducting the stop has an articulable and specific basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take place; (2) the purpose of the detention is reasonable; and (3) the scope and character of the intrusion are reasonably related to its purpose. *See People v. Cagle*, 688 P.2d 718, 721 (Colo. 1984).

## A.

Assessing whether the police had an "articulable and specific basis in fact" for suspecting that Smith could be involved in criminal activity requires an examination of the totality of the circumstances. *See People v. Sutherland*, 886 P.2d 681, 686 (Colo.1994). In making this determination, police officers must have more than an "unparticularized suspicion or hunch" that criminal activity is afoot. *See People v. Rahming*, 795 P.2d 1338, 1341 (Colo.1990) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). The inquiry is objective, considering the facts and circumstances known to the officer immediately prior to the stop. See *id.* Relevant circumstances include the lateness of the hour, the character of the area, the reaction to the

presence of police, and whether a companion is being arrested. *See Hampe v. Tipton*, 899 P.2d 325, 328 (Colo.App.1995).

In *Hampe,* the court of appeals found an adequate basis to suspect criminal activity and conduct a stop under circumstances similar to this one. *See id.* In that case, the defendant parked his car across from officers who were conducting a stop of another vehicle, and turned off his headlights, apparently to observe the police. The defendant then pulled his car directly across the street from the officers with his motor running and parking lights on. *See id.* at 327. The court of appeals found that in such circumstances the officers had a reasonable concern for their safety, and were justified in stopping the defendant to investigate his activities. *See id.* at 328. In fact, the court held that the evidence supported the conclusion that "any police officer who in these circumstances was not concerned with safety would be putting himself or herself in jeopardy and that a reasonable police officer would make a limited investigation to determine what was afoot." *Id.*

Given the totality of the circumstances known to the officers at the time they approached the Suburban, it was objectively reasonable for Officer Jones and the other officers to infer that the driver of the Suburban was acting in concert with the driver of the stolen vehicle and intended to impede police authority. The officers had more than "an unparticularized hunch" that Smith may have been involved in some type of criminal activity, and accordingly had a sufficient articulable basis in fact to conduct the stop.

## B.

Evaluating the second prong of the test, whether the purpose of the intrusion was reasonable, requires a two-step inquiry. The court must first determine the officer's actual purpose in making the stop and ancillary protective search. *Cagle*, 688 P.2d at 722. Here, the officers' purpose was to avoid ambush and question the driver of the Suburban in connection with the questioning and possible arrest of the driver of a stolen vehi-

cle. In pursuit of that purpose, they confined Smith and searched his car.

Second, the court must determine whether this purpose was reasonable. *See id.* This means that the court should examine the objective circumstances surrounding the stop and search in order to arrive at its own factual determination of the officer's purpose; and "only then may the court conclude that the purpose was reasonable." *Id.*

As to the latter part of the inquiry, this court repeatedly has found a reasonable purpose in conducting an investigatory stop and protective search when the suspect made a furtive gesture in response to the initial police contact. *See People v. Jackson,* 948 P.2d 506, 508 (Colo.1997) (holding that a weapons search was reasonable when defendant pulled a coat over his lap in response to a police stop); *Melgosa,* 753 P.2d at 227 (finding a weapons search proper when a passenger placed an object under the seat); *Cagle,* 688 P.2d at 723 (holding a weapons search would be reasonable when a passenger leaned over in his seat after the officer activated overhead lights to signal an automobile to stop).

Similarly, in *Sutherland,* this court found an investigatory stop and weapons search to be reasonable when an officer had reason to be concerned with retaliatory actions from the companion of a suspect who was the focus of a stop. *See* 886 P.2d at 687. In that case, an officer followed a vehicle when he suspected the occupants of theft. *See id.* at 686. The driver stopped the vehicle and rapidly approached the officer on foot demanding to know why the officer was following his car, while the other suspects remained seated in the vehicle. *See id.* at 687. In order to ensure his personal safety, the officer stopped the driver, conducted a pat down search, and then separated him from the other suspects. *See id.* The court concluded that under the circumstances, the purpose of the intrusion on the driver was reasonably related to concerns for the officer's safety. *See id.*

In this case, the officers' testimony supports the conclusion that they stopped Smith to assure that he would not interfere with proceedings concerning the stolen vehicle and that they searched for weapons to secure their own safety. Officer Jones testified that he requested the assistance of other officers out of a concern for his safety. Officer Rodarte testified that his initial reaction on receiving Jones's radio call was that Jones faced a possible ambush. Officer Rodarte also testified that his intent in searching Smith's vehicle was to search "incident to arrest and for officer safety purposes."

Evidence in the record also supports the conclusion that it was objectively reasonable for Officer Jones to conduct a search for weapons. Given the circumstances surrounding the arrival of Smith's Suburban at the scene of the traffic stop, a reasonable officer would have inferred that Smith was intending to interfere with police authority. A reasonable officer also would have recognized the potential danger in the situation and conducted a protective search in order to secure his safety.

### C.

 The third prong of the test, whether the officers used an amount of force that was reasonably related in scope and character to ensure their safety during the period of detention or whether the officers' use of force was excessive, is the pivotal inquiry in this case. *See Cagle,* 688 P.2d at 722.

The United States Supreme Court has long held that investigatory stops necessarily involve some degree of physical coercion, or threat thereof, in order to carry out the stop. *See Terry,* 392 U.S. at 22–27, 88 S.Ct. 1868. Although the Supreme Court has not had the occasion to determine what degree of force is excessive in an investigative stop, the Court has outlined the analysis necessary to make that determination. *See Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that a claim of excessive force during an investigatory stop should be analyzed under Fourth Amendment principles rather than substantive due process principles). The Court stated that the nature and quality of the intrusion on the individual must be balanced against the government's interests. *See id.* at 396, 109 S.Ct. 1865. This objective analysis takes into account all the circumstances of the case including "the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court specifically observed that this must be judged from a reasonable officer's perspective at the time of the stop, not with the advantage of hindsight. *See id.* The Court also noted, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

Because of the concern for officer safety, especially in investigatory stops involving automobiles, the use of force to detain a suspect may be reasonable. *See Long,* 463 U.S. at 1051, 103 S.Ct. 3469; *Breidenbach,* 875 P.2d at 887. Accordingly, this court has upheld the use of weapons during an investigatory stop. *See Archuleta,* 980 P.2d at 513 (finding a stop reasonable when the officer drew his weapon as he approached the suspect and interrogated him); *People v. Lewis,* 659 P.2d 676, 682 (Colo.1983) (holding that the scope of a stop was reasonably related to its purpose when officers approached a suspect in a vehicle with their weapons drawn because they had been cautioned by other officers that the suspect may be armed).

Similarly, the use of handcuffs in an investigatory stop may be reasonable. *See People v. Bland,* 884 P.2d 312, 322 (Colo.1994) (upholding the use of handcuffs during a noncustodial arrest when the officers had noticed a weapon nearby). Numerous courts in other jurisdictions similarly have upheld various means of physical restraint during investigative stops. *See* LaFave, *supra,* § 9.2(d) at 36–37 (noting that courts have sanctioned a wide variety of police actions to detain suspects in investigative stops including the drawing of weapons, seizing the suspect's car keys, deflating the suspect's tires, using handcuffs, laying the suspect on the ground, and surrounding the suspect with multiple officers).

Here, the officers used a reasonable amount of force in light of the situation. The officers were investigating a felony at nearly 3:00 a.m., and the initial suspect in the stop appeared to have reacted to the police by calling an associate. At the time of the stop, it was dark and the officers did not know how many people were in the Suburban. These facts justified the officers in using some force to take charge of the situation. Overall, the officers conducted themselves in a way that allowed them to avoid injury or death until they could confirm or dispel the suspicion that Smith was involved in criminal activity. Given the circumstances, the amount of force they used was not clearly unreasonable or excessive.

Therefore, we conclude that the officers' investigatory stop of Smith meets all three prongs of the test for reasonableness under the Fourth Amendment.

## IV.

The final question for the court is whether the evidence discovered during the protective search of Smith's automobile may be admitted into evidence. When police conduct an investigatory stop during a traffic stop, they may search the passenger compartment of the vehicle for weapons if the officers reasonably believe that the occupants pose a safety risk. *See Long,* 463 U.S. at 1049. During a protective search, police may search all compartments where a weapon may be hidden. *See id.*

When an officer is constitutionally justified in conducting a protective search of an automobile for weapons, and other evidence of a crime is discovered, the plain view doctrine allows the officer lawfully to seize the object without a search warrant. *See Melgosa,* 753 P.2d at 226 (holding that stolen goods discovered during a protective search were admissible); *Lewis* 659 P.2d at 682 (upholding admission of drugs seized during a weapons search). "A plain view seizure involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Melgosa,* 753 P.2d at 226 (quoting *Texas v. Brown,* 460 U.S. 730, 738, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)).

Here, the officers were entitled to search Smith's car for weapons because they justifiably believed that they were dealing with a potentially dangerous suspect. The fruits of that search, the loaded handgun and the cocaine, were properly discovered during the course of the protective search. Both items were in compartments large enough to contain a weapon or were in plain view, and the officers had probable cause to associate both the gun and the drugs with criminal activity.

## V.

In conclusion, we hold that given the totality of the circumstances facing the police, the amount of force used in detaining Smith was not patently unreasonable. The officers feared for their own safety, and the steps they took were dramatic, but not unreasonable. The police had reasonable grounds to suspect that Smith was involved in criminal activity; the stop had a valid purpose; and the scope of the stop was not excessive. Therefore, the stop satisfied the requirements of the Fourth Amendment.

Pursuant to the valid investigatory stop, the officers were entitled to conduct a protective search of the Suburban. The officers discovered the evidence in plain view, and the items should be admissible evidence. Accordingly, we reverse the trial court's suppression order, and return this case to that court for further proceedings.

Justice COATS does not participate.