Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 10, 2018

**2018 CO 71**

**No. 18SA56, <u>People v. Pappan</u>—Searches and Seizures—Emergencies and Exigent Circumstances—Plain View Doctrine.**

In this interlocutory appeal, the supreme court considers whether the trial court erred in suppressing two laser-sight rifles seized from the defendant's residence during a warrantless search conducted after the defendant and two other occupants exited the residence. The supreme court holds that the warrantless search was justified under the exigent circumstances exception to the warrant requirement. More specifically, the court concludes: (1) that the officers had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety by clearing the residence for other occupants, and (2) that the manner and scope of the search was reasonable because it was protective in nature and narrowly tailored to neutralize the threat confronting the officers. The court further holds that the seizure of the laser-sight rifles was justified by the plain view doctrine. Accordingly, the decision of the trial court is reversed.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 71

### Supreme Court Case No. 18SA56
*Interlocutory Appeal from the District Court*
Las Animas County District Court Case No. 17CR193
Honorable Leslie J. Gerbracht, Judge

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Michael Andrew Pappan.

### Order Reversed
*en banc*
September 10, 2018

**Attorneys for Plaintiff-Appellant:**
Henry L. Solano, District Attorney, Third Judicial District
Matthew P. Holmes, Deputy District Attorney
  *Trinidad, Colorado*

**Attorneys for Defendant-Appellee:**
Megan Ring, Public Defender
Dariel Weaver, Deputy Public Defender
  *Trinidad, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents, and **JUSTICE HART** joins in the dissent.

¶1 The People brought this interlocutory appeal pursuant to section 16-12-102(2), C.R.S. (2017), and C.A.R. 4.1, seeking review of the trial court's order suppressing evidence of two laser-sight rifles seized during a warrantless search of defendant Michael Pappan's residence. We now reverse the trial court's suppression order. We hold that the officers' warrantless search was justified by exigent circumstances. More specifically, we conclude: (1) that the officers had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety, and (2) that the manner and scope of the search was reasonable. We further hold that the warrantless seizure of the laser-sight rifles was justified by the plain view doctrine.

## I. Facts and Procedural History

¶2 Around 6:40 in the evening, an individual called 911 to report that he observed a man in the green house directly across the street pointing a laser-sight rifle at him. Apparently scared for his safety, after requesting assistance, the 911 caller left his residence in his car and parked nearby. Trinidad Police Department officers responded to the call shortly thereafter. Officer De La Fuente, among the first officers on scene, testified that she was familiar with the neighborhood and was aware that the 911 report was consistent with the types of crimes that are common in that area.

¶3 Upon arriving, the officers observed that a female standing on the front porch of the green house avoided them by immediately going inside the house and locking the screen door behind her, despite their commands to stop and their requests to talk to her. Officer De La Fuente followed her and tugged on the screen door to open it; she then asked the female to come outside and pulled her out to the porch. While standing just

2

inside the doorway, Officer De La Fuente noticed a male, later identified as Pappan, running down the stairs from the second floor; he was yelling as he asked questions and made comments. The officer asked him to come out to the porch as well, and he did so. Because he disregarded another officer's commands while on the porch, he was placed in handcuffs and detained. Based on information the officers received from the female, they next called out for a child to come out of the house. A child exited, but only after multiple requests by the officers.

¶4 The atmosphere on the porch was chaotic. Further, none of the parties the officers had contacted had the laser-sight rifle referenced by the 911 caller, and the officers had not yet identified a suspect or obtained reliable information about whether there were other parties inside the residence.[1] Concerned for their safety, the officers "cleared" the house for other occupants. They made a peaceable entry into the house, albeit with their guns drawn. Inside, in an upstairs room, they saw in plain view and collected two laser-sight rifles. No other individuals were found in the house.

¶5 Pappan was subsequently charged with felony menacing, reckless endangerment, and disorderly conduct. Following a pretrial hearing, the trial court granted Pappan's motion to suppress evidence obtained during the search of his home, finding that "it would have been better practice for the police to obtain a search warrant." The People then filed this interlocutory appeal.

---

[1] The officers had a difficult time locating the 911 caller and did not speak with him until later in their investigation.

## II. Standard of Review

¶6    In reviewing an order addressing a motion to suppress evidence, we defer to the factual findings made by the trial court. People v. Funez-Paiagua, 2012 CO 37, ¶ 6, 276 P.3d 576, 578. So long as the trial court's factual findings are supported by competent evidence, we will not disturb them. Id. However, our review of the trial court's legal conclusions vis-à-vis the constitutionality of the challenged search and seizure is de novo. Id.; see also People v. Syrie, 101 P.3d 219, 222 (Colo. 2004) ("The legal conclusions of the trial court are subject to de novo review and reversal [is required] if the court applied an erroneous legal standard or came to a conclusion of constitutional law that is inconsistent with or unsupported by the factual findings.").

## III. Analysis

¶7    The People argue that the trial court erred in granting Pappan's motion to suppress because the exigent circumstances present, in conjunction with the plain view doctrine, justified the officers' warrantless search and seizure. We agree.[2]

### A. Relevant Law

¶8    The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit "all unreasonable searches and seizures." Mendez v. People, 986 P.2d 275, 279 (Colo. 1999). Although neither constitutional provision specifies when law enforcement must obtain a warrant before conducting a

---

[2] Pappan's motion did not challenge, and the trial court did not address, the legality of Officer De La Fuente's initial entry just inside the doorway of Pappan's residence to pull the female out to the porch. We limit our analysis accordingly.

4

search, the United States Supreme Court has inferred from the text of the Fourth Amendment that "a warrant must generally be secured." Kentucky v. King, 563 U.S. 452, 459 (2011). It is now "a bedrock principle . . . that 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" People v. Brunsting, 2013 CO 55, ¶ 18, 307 P.3d 1073, 1078 (quoting King, 563 U.S. at 459). But this presumption may be overcome in some situations. Id. at ¶ 19, 307 P.3d at 1078–79. Because the "ultimate touchstone" of search and seizure jurisprudence is reasonableness, there are certain exceptions to the warrant requirement. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). When police officers conduct a warrantless search, the People bear the burden of establishing that the search "is supported by probable cause and is justified under one of the narrowly defined exceptions to the warrant requirement." People v. Winpigler, 8 P.3d 439, 443 (Colo. 1999).

¶9 Pappan concedes that the People made "a clear showing of probable cause," and the record shows that the officers had probable cause to believe that a crime had been committed and that evidence of that crime, namely a laser-sight rifle, would be located in his residence. The parties disagree, however, on whether the People met their burden of demonstrating both that the exigent circumstances exception justified the warrantless search of Pappan's residence, and that the plain view exception justified the warrantless seizure of the two laser-sight rifles.

¶10 We have repeatedly acknowledged that there is an exception to the warrant requirement "when exigent circumstances exist that necessitate immediate police action." Id.; see also Brunsting, ¶ 25, 307 P.3d at 1079 (when exigent circumstances are

present, "the public's interest in a timely police response . . . outweighs the individual's privacy interests."). In Brunsting, we held that "officer safety concerns fall within the exigent circumstances exception when (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." Brunsting, ¶ 32, 307 P.3d at 1081. In applying the first part of this test, we considered "the totality of the circumstances . . . 'as they would have appeared to a prudent and trained police officer at the time of the challenged entry.'" Id. at ¶ 33, 307 P.3d at 1081 (quoting Winpigler, 8 P.3d at 446). The second part of the test required us to focus on the totality of the circumstances surrounding the search actually conducted. Id. at ¶ 39, 307 P.3d at 1082.

¶11 Another well-established exception to the warrant requirement is the plain view doctrine, which provides that police officers "are not required to close their eyes to any evidence that they plainly see while conducting otherwise legitimate searches." People v. Gothard, 185 P.3d 180, 183 (Colo. 2008) (quoting People v. Pitts, 13 P.3d 1218, 1222 (Colo. 2000)). There are three requirements to the plain view doctrine: (1) the intrusion must have been legitimate; (2) the officers must have had a reasonable belief that the evidence seized was incriminating; and (3) the officers must have had a lawful right of access to the evidence. Id. The first prong is met when probable cause and exigent circumstances justify the officers' presence. Id. at 183–84. "The second prong exists when police have probable cause to believe the evidence is incriminating, and the incriminating nature is immediately apparent" to the officers. Id. at 184. "As with other exceptions to the warrant requirement, the exigent circumstances exception may

combine with the plain view doctrine to justify a warrantless search and seizure." People v. Kluhsman, 980 P.2d 529, 535 (Colo. 1999).

## B. Application

### 1. Exigent Circumstances Exception

¶12 Based on the evidence presented at the hearing, we conclude that when the officers entered Pappan's residence, they had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety. We further conclude that the evidence introduced at the hearing established that the manner and scope of the warrantless search was reasonable. Therefore, we hold that the People satisfied Brunsting's two-part test for application of the exigent circumstances exception when officer safety concerns are implicated.

### a. The Officers Had an Objectively Reasonable Basis to Believe There Was an Immediate Need to Protect Their Lives or Safety

¶13 In determining that the officers had an objectively reasonable basis to believe there was an immediate need to protect their lives or safety, we consider the totality of the circumstances. However, we view the circumstances as a prudent and trained officer would have at the time of the search.

¶14 It was close to night time when the officers responded to Pappan's house pursuant to a 911 call. A man in Pappan's residence had reportedly pointed a laser-sight rifle at the neighbor who lived in the house across the street. The neighbor was sufficiently concerned for his safety that after calling 911 he drove away from his

7

residence in his car and parked nearby. The officers were aware that the 911 report was consistent with the types of crimes that are common in that area.

¶15   The first person the officers encountered, a female on the front porch of Pappan's house, immediately avoided them by going inside the house and locking the screen door behind her, despite their commands to stop and their requests to talk to her. Officer De La Fuente had to yank the screen door open and pull her out to get her on the porch. Moments later, Officer De La Fuente saw Pappan running down the stairs from the second floor of the residence and heard that he was yelling. Although he complied with her request to come out to the porch, he subsequently disregarded another officer's commands. As a result, the officers placed him in handcuffs and detained him. The officers then had to call for a child to come out of the house multiple times before the child finally exited. At the hearing, Officer De La Fuente described the situation as chaotic.

¶16   Importantly, the officers realized that none of the individuals on the porch were in possession of a laser-sight rifle or any type of firearm. Consequently, they had a reasonable basis to believe that the laser-sight rifle the 911 caller complained about was still in Pappan's house. Moreover, the officers did not yet know whether the perpetrator who pointed the laser-sight rifle at the 911 caller remained in the house. Nor did the officers have reliable information as to whether there were other individuals in the house, including on the second floor. And, because the officers had a difficult time locating the 911 caller, he was not available to provide additional information to them at that time.

¶17    Under the totality of the circumstances, as they would have appeared to a prudent and trained officer, Officer De La Fuente and her fellow officers faced a serious risk to their lives or safety that understandably caused them concern. While standing on the front porch of Pappan's house, the officers were vulnerable to being ambushed by an individual in the house with access to the laser-sight rifle reportedly on the premises. Therefore, they had objectively reasonable grounds to believe there was an immediate need to protect themselves. The threat they faced was real, and the fear they felt was objectively reasonable. Ignoring the situation they confronted would have imperiled their safety.

¶18    Pappan nevertheless argues that the officers' concern for their safety did not justify clearing his residence for other occupants because they had already concluded he was the individual who reportedly pointed a laser-sight rifle at the 911 caller. However, the trial court did not make a finding as to when, in relation to the search conducted, the officers identified the male detained on the porch as the suspect.[3] Further, the dispatch CD, which contains the 19 audio-recorded communications dispatch had with the 911 caller and the responding officers, suggests that the officers identified the male on the porch as the suspect after they cleared the house and learned

---

[3] The trial court found that "it was clear on the dispatch tape that the reporting party unequivocally stated it was Mr. Pappan with the firearm," and that dispatch communicated this information to at least one unknown officer at some unknown time. But the trial court did not find that this information was provided to the responding officers before they cleared Pappan's residence for other occupants, and the record would not have supported such a finding.

9

that there were no other male occupants present.[4]  Immediately after the officers informed dispatch that they were going to clear Pappan's residence for other occupants, there were no communications with dispatch for a handful of minutes.  This radio silence is consistent with the officers clearing Pappan's residence for other occupants. During the next radio communication by the officers who cleared the house, they informed dispatch for the first time that the male on the porch, Pappan, was the suspect who allegedly pointed a laser-sight rifle at the 911 caller.

¶19    In any event, Pappan's contention is inconsequential.  Even if the officers had known before the search that the male detained on the porch was the suspect, their actions still would have been justified because there could have been other parties in the residence and the laser-sight rifle had not yet been located.  The threat would have been just as real, and the officers' concern for their lives or safety would have been just as objectively reasonable.  Thus, contrary to Pappan's assertion, application of the exigent circumstances exception in this case does not hinge on whether the officers identified the male on the porch as the suspect before or after conducting their search.

¶20    We recognize that Pappan and the female indicated to the officers before the search that there were no other occupants in the house.  But the officers were not required to rely on that information or to accept it as accurate.  Both Pappan and the

---

[4] Officer De La Fuente testified on cross-examination that when Pappan came down the stairs, she realized that his gender fit the perpetrator's gender.  Pappan's gender, though, could not rule out the potential that a different male was the perpetrator.  It was only after the officers cleared the house and discovered there were no other males present that Pappan could be singled out as the suspect.

female had refused to heed the officers' commands and had been less than cooperative. Additionally, the possibility existed that Pappan, as a male, would later be identified as the suspect. Moreover, as Officer De La Fuente testified, she typically assumes that people are lying to her because it is not uncommon for people to lie to police officers.[5]

¶21 The trial court acknowledged Officer De La Fuente's testimony that the officers did not know when they conducted the search whether there were other people in the house. However, it pointed out that the officers "did not search the basement." This observation is of no import to our analysis. First, the trial court did not find incredible Officer De La Fuente's testimony that she and her fellow officers entered the house for officer safety reasons. Nor did the trial court question Officer De La Fuente's general credibility. Second, the dispatch CD corroborates Officer De La Fuente's testimony. The CD reflects that the officers informed dispatch that they were going to clear the house to make sure no one else was inside. Finally, we decline Pappan's invitation to speculate that the officers' failure to check the basement reflects they were not genuinely concerned about their safety and were, instead, looking for an excuse to search the house for evidence. Once the two laser-sight rifles were located and collected, the officers may reasonably have concluded there was no need to check the basement because any threat to their safety had been neutralized. It is equally plausible

---

[5] This opinion should not be misinterpreted as establishing exigent circumstances to clear a residence without a warrant whenever police officers assume a resident is lying to them about whether there are other occupants inside. Rather, we simply conclude that where, as here, there is an objectively reasonable basis to believe police officers have an immediate need to clear a residence for occupants in order to protect their lives or safety, they are not required to accept as true a representation by a resident that there is no one else inside.

11

that the officers viewed the basement as an area of the house that posed no imminent threat to their safety, especially since they had not observed anyone walk upstairs from the basement.

¶22    That there were officers stationed around Pappan's residence at the time of the search does not alter our analysis either.  This circumstance did not affect the threat to the officers or their concern for their safety.  To be sure, Officer De La Fuente testified that at least one officer had a visual on each exit of the residence.  But the fact remains that the officers had probable cause to believe there was a laser-sight rifle inside the residence that may have been accessible to an unknown individual.  Having a visual on all the exits of the residence did not protect the officers from someone armed with a rifle lying in wait.

¶23    In sum, we find that the People demonstrated at the hearing that the officers had objectively reasonable grounds to believe that they had an immediate need to protect their lives or safety.  We therefore proceed to explore the reasonableness of the officers' response to the perceived danger.

### b.  The Manner and Scope of the Warrantless Search was Reasonable

¶24    When we assess whether the manner and scope of a warrantless search was reasonable, we again look at the totality of the circumstances.  Here, though, our focus is on the circumstances surrounding the search conducted.

¶25    We begin this part of our analysis, as we did in Brunsting, by drawing guidance from our decision in People v. Aarness, 150 P.3d 1271 (Colo. 2006).  In Aarness, police officers received an anonymous tip indicating that Aarness had outstanding warrants

for his arrest.  Id. at 1274.  The same tip included Aarness's height, weight, hair color, and eye color, and reported that Aarness was armed with a loaded handgun.  Id.  After verifying the existence of the outstanding warrants, six officers responded to Aarness's apartment.  Id.  Three of them knocked on the door with their guns drawn.  Id.  When Aarness's brother opened the door, the officers saw Aarness sitting in a recliner.  Id.  Because Aarness immediately shoved his hand between the cushion and the armrest of the recliner, the officers believed he was reaching for a weapon and ordered him to show his hands.  Id.  Concerned for their safety, the officers pulled Aarness's brother out of the apartment and ordered two other individuals to exit the apartment.  Id.  A few seconds later, Aarness complied with the officers' order to raise his hands.  Id.  The officers nevertheless entered the apartment with guns drawn, arrested Aarness, and cleared the apartment for other occupants.  Id.

¶26    We concluded that the manner and scope of the officers' entry to arrest Aarness and clear the apartment was reasonable in light of the officer safety concerns present.  Id. at 1279–80.  In so doing, we considered, among other factors, "whether the entry [was] made peaceably" and "[w]hether the entry [was] made at night."  Id. at 1279.

¶27    In Brunsting, we also relied on People v. Smith, 13 P.3d 300 (Colo. 2000), and Smith is equally instructive here.  There, a police officer conducted a traffic stop shortly before 3:00 a.m. for driving with an obstructed windshield.  Id. at 303.  After the driver handed him her license and informed him she did not have registration paperwork because the vehicle she was driving belonged to a friend, the officer returned to his patrol car and ran checks on the license plate number of the vehicle and on the vehicle

13

identification number.  Id.  The latter check revealed that the vehicle was stolen.  Id.  While in his patrol car, the officer noticed that the driver made a call using a cell phone.  Id.  A Suburban with tinted windows then pulled up behind the officer's patrol car.  Id.  Because the driver of the Suburban, Smith, left his headlights on, the officer could not determine how many people were in that vehicle.  Id.  Concerned for his safety and fearing "an ambush," the officer called for backup.  Id.  Another officer responded within two to five minutes, and the two officers approached the Suburban with their guns drawn and ordered Smith to turn off the ignition and drop his keys outside his window.  Id.  He complied.  Id.  After additional backup arrived, the officers yelled at Smith to exit his vehicle slowly with his hands in the air.  Id. at 303–04.  Once out of the Suburban, the officers ordered Smith to turn around so they could conduct a visual search for weapons, ordered him into a kneeling position with his hands behind his head, commanded him to lie prone, handcuffed him, and took him into custody.  Id. at 304.

¶28    Because a subsequent search of the Suburban yielded a loaded handgun and crack cocaine, Smith was charged with several drug and weapon offenses.  Id.  In reversing the trial court's order granting Smith's pretrial motion to suppress, we examined the totality of the circumstances and ruled that "it was clearly reasonable for the officers to believe that the occupant(s) of the Suburban could pose a threat to their safety."  Id. at 305.  We therefore concluded that the officers "were entitled to order Smith out of the car, and conduct a protective search for weapons."  Id. Significantly, although we acknowledged that the officers' intrusions were unconventional, we

14

reasoned that they were justified based on the circumstances, which reflected that the force used constituted a reasonable precaution necessary for the protection and safety of the officers:

> The degree of force that the officers used was significant, but was not disproportionate to the circumstances in which they found themselves. The officers' display of weapons and means of detaining Smith were legitimate safety precautions taken in response to the uncertain danger posed by the Suburban's occupant(s). The officers were entitled to use some force until they secured the situation, were able to ascertain Smith's identity, whether he was armed, and the reasons for his presence at the scene.

Id. at 305–06.

¶29 Here, contrary to the general rule governing searches and seizures, the officers searched Pappan's home without obtaining a warrant. But the warrantless search was justified by the circumstances, which reflected that the officers needed to take immediate action to protect themselves. As they stood on the porch of Pappan's home, the officers were as vulnerable as the arresting officers were in Aarness when they saw Aarness shove his hand between the cushion and the armrest of his recliner, and as vulnerable as the first responding officer was in Smith when the Suburban pulled up behind his patrol car. Officer De La Fuente and her fellow officers reasonably feared that they would be ambushed by an unknown individual inside the house with access to the laser-sight rifle believed to be on the premises.

¶30 Given the seriousness of the imminent threat present, the manner and scope of the officers' search was reasonable. The search was protective in nature and was narrowly tailored to neutralize the threat confronting the officers. The officers entered

15

the house peaceably, albeit with their guns drawn, to clear the house for other occupants. They walked through the first two floors of the house strictly to check for people. There was no way for the officers to protect themselves from the danger they faced other than to do a walk-through inside the house to determine whether anyone else was there. And, after securing the two laser-sight rifles and ensuring there were no other occupants in the house, the search ended.

¶31 Considering the totality of the circumstances, we are convinced that the manner and scope of the officers' search was reasonable. Hence, we find that the People met the second element of the test we set forth in Brunsting.

## 2. Plain View Exception

¶32 Having determined that the officers' safety concerns fell within the exigent circumstances exception to the warrant requirement, we next address whether the seizure of the two laser-sight rifles was justified. Based on the plain view doctrine, we conclude that it was.

¶33 Because we have already found that probable cause and exigent circumstances justified the officers' entry into Pappan's residence, the first prong of the plain view doctrine, which requires that the intrusion be legitimate, was met. The remaining two prongs were likewise satisfied. First, when the officers saw the laser-sight rifles, they had probable cause to believe that the rifles constituted incriminating evidence because the 911 caller had reported that the firearm pointed at him was a laser-sight rifle. Under the circumstances, the incriminating nature of the rifles was also immediately apparent

16

to the officers.[6] Second, the officers had a lawful right of access to the laser-sight rifles because they were conducting a legitimate search and were not required to close their eyes to incriminating evidence that was plainly visible.

¶34 In short, the plain view doctrine authorized the officers to seize the two laser-sight rifles without a warrant. Therefore, the warrantless seizure did not violate the Fourth Amendment to the United States Constitution or article II, section 7 of the Colorado Constitution.

## IV. Conclusion

¶35 We hold that the trial court erred in finding that the officers violated Pappan's constitutional right to be free from unreasonable searches and seizures. Therefore, we reverse the trial court's suppression order and remand the case for further proceedings.

**JUSTICE GABRIEL** dissents, and **JUSTICE HART** joins in the dissent.

---

[6] The officers did not seize the third firearm located in Pappan's residence. Because that firearm was not consistent with the rifle described by the 911 caller, the officers lacked probable cause to believe it constituted incriminating evidence. Nor was the incriminating nature of the unrecovered firearm immediately apparent to the officers.

JUSTICE GABRIEL, dissenting.

¶36    The majority concludes that exigent circumstances justified the warrantless search of defendant-appellee Michael Pappan's home.  Because I believe that the district court correctly found that the evidence presented at the suppression hearing did not support such a conclusion, I respectfully dissent.

## I.  Factual Background

¶37    I need not repeat the majority's recitation of the salient facts.  I do, however, highlight the following facts, virtually all of which were undisputed, because these facts inform my analysis of this case.

¶38    The matter at issue unfolded when a 911 caller alleged that his across-the-street neighbor was pointing a rifle with a laser scope at the caller's house.  At no time did the caller or anyone else report that any shots were fired.

¶39    A number of officers responded, and Officer De La Fuente saw a woman who turned out to be Pappan's wife go into the house and lock the door.  Officer De La Fuente ordered the woman to come outside, and she did so.  The officer then ordered all other parties in the house to come out, and when she did, she saw Pappan, who fit the description of the suspect whom the officers were seeking, come down the stairs and leave the house.

¶40    At this point, the record reveals that Officer De La Fuente understood that a child remained in the house.  The child soon came out, however, and Officer De La Fuente thus had every reason to believe—and on the facts presented, any objectively reasonable officer in her position would have believed—that everyone who had been in

the house was now out of the house. Indeed, the officer confirmed this by asking the people who had come out whether anyone remained inside. All responded that no one was still in the house.

¶41   Notwithstanding the foregoing, and based <u>solely</u> on the fact that Officer De La Fuente does not believe what people tell her, she and several officers entered the house, which was by then completely secured by other officers, presumably to conduct a protective sweep.

¶42   Although Officer De La Fuente ultimately testified—and the People now contend—that such a sweep was necessary to ensure that no one else was in the house, <u>no</u> evidence suggested that anyone else was inside, and the officers did not search the entire house, as they would have done in a typical protective sweep. Instead, they searched only the first and second floors (but not the basement), and they stopped their search as soon as they confiscated several weapons from the second floor, thus suggesting that the search here was not actually a protective sweep, but rather was a search for evidence.

## II.  Analysis

¶43   I begin by setting forth the applicable law and then apply that law to the facts of this case.

### A.  The Fourth Amendment and the Exigent Circumstances Exception

¶44   The Fourth Amendment provides, in pertinent part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Likewise, the Colorado

2

Constitution provides, in pertinent part, "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures." Colo. Const. art. II, § 7.

¶45 It has long been settled that the physical entry into a person's home is the "chief evil against which the Fourth Amendment is directed." People v. O'Hearn, 931 P.2d 1168, 1173 (Colo. 1997) (internal quotations omitted); see also Payton v. New York, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Accordingly, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton, 445 U.S. at 586 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971)); accord O'Hearn, 931 P.2d at 1173.

¶46 Notwithstanding the foregoing, courts have recognized several exceptions to the warrant requirement, and the People bear the burden of establishing one of these exceptions. People v. Amato, 562 P.2d 422, 423 (Colo. 1977).

¶47 As pertinent here, one such exception is the so-called "exigent circumstances" exception. People v. Brunsting, 2013 CO 55, ¶ 25, 307 P.3d 1073, 1079. This exception is limited to situations in which, due to an emergency, a compelling need for immediate police action militates against strict adherence to the warrant requirement. People v. Gomez, 632 P.2d 586, 592 (Colo. 1981). The exception is thus a narrow one, and it applies only when the People establish both probable cause to search and exigent

3

circumstances justifying a warrantless entry. <u>People v. Jansen</u>, 713 P.2d 907, 911 (Colo. 1986).

¶48 Exigent circumstances have been limited to only a few factual circumstances. The People assert that this case involves one such circumstance, namely, the scenario in which a colorable claim of emergency threatens the life or safety of another. <u>Brunsting</u>, ¶ 26, 307 P.3d at 1079. To establish such a scenario here, the People were required to show both an immediate crisis inside the house and the probability that police assistance would have helped alleviate that crisis. <u>Id.</u> at ¶ 29, 307 P.3d at 1080. These requirements are consistent with the fact that the primary purpose of such a warrantless entry is to render emergency assistance and not merely to search for evidence. <u>People v. Allison</u>, 86 P.3d 421, 426 (Colo. 2004).

## B. Application

¶49 Applying the foregoing principles to the evidence presented in this case leads me to conclude that the district court correctly found that the People did not satisfy their burden of establishing the applicability of the exigent circumstances exception here.

¶50 Although the People's briefs in this case principally contest facts that the district court found against the People, I see no evidence supporting the People's contention that the officers on the scene had an objectively reasonable basis to believe that they had an immediate need to enter the home to protect their lives and safety or the lives and safety of others.

¶51 As noted above, the record demonstrates that all of the people whom the officers believed to have been in the house had exited, and they all told Officer De La Fuente

4

that no one remained in the house. The record reveals no evidence to the contrary and specifically no evidence of a second person allegedly menacing the across-the-street neighbor (or even of a report of such a second person) and no evidence of an ongoing threat. To the contrary, the record indicates that the neighbor reported that one man was pointing a gun at the neighbor's house, and Officer De La Fuente testified at the suppression hearing that Pappan, who had exited the house, fit the description of that man, whether she knew his precise identity or not. In addition, the record contains no evidence that any shots were fired or that anyone was about to fire any shots.

¶52 Thus, the only evidence justifying the officers' warrantless entry into Pappan's home was Officer De La Fuente's statement that she does not believe what people tell her. In my view, however, a presumption that everyone lies, absent any factual basis to support a conclusion that anyone was lying, cannot suffice to justify a warrantless entry into a suspect's home. If it could, then the exigent circumstances exception would have no limit. Police officers would always be permitted to enter a suspect's home simply by stating a subjective, albeit factually unsupported, view that they did not believe that the house was empty, even if they were told precisely the opposite and even if they had no factual basis to disbelieve what they were told.

¶53 Nor do I believe that a warrantless search can be supported by an officer's subjective assumption that a second suspect might possibly be in a home, absent any factual basis to support such an assumption. Again, if such an assumption were sufficient, then the exigent circumstances exception would be rendered meaningless.

5

Exigent circumstances would exist in virtually every case because police officers could almost always truthfully say that a second suspect was a possibility.

¶54 Last, I find it telling that the People have offered no response to Pappan's argument that the officers' purported protective sweep here was invalid and a pretext for an exploratory search for evidence, given that the police did not search the entire house and stopped their purported sweep as soon as they confiscated the guns from the second floor. Obviously, were the police truly engaged in a protective sweep for other people in the house, they would have searched the entire house, and they would not have stopped their search once they confiscated several guns from the second floor. Based on the People's own reasoning, another gunman could have been hiding in the basement.

¶55 On this point, I am not persuaded by the majority's statements that (1) once the guns were seized, the officers "may reasonably have concluded" that they did not need to search the basement and (2) "it is equally plausible" that the officers perceived no threat that anyone may have been in the basement. Maj. op. ¶ 21. No evidence supports either of these assertions as to what the officers may have perceived (Officer De La Fuente, the People's only witness at the suppression hearing, did not so testify). Nor do I believe that this court should speculate as to such facts, particularly given that the People had the burden of proving the applicability of the exigent circumstances exception in this case.

¶56 Nor am I persuaded by the majority's reliance on People v. Aarness, 150 P.3d 1271, 1274 (Colo. 2006), and People v. Smith, 13 P.3d 300, 303–04 (Colo. 2000). See maj.

op. ¶¶ 25–29. As the majority's recitation of the facts of those cases makes clear, there, the evidence established a clear and non-speculative threat to the officers at issue. See id. at ¶¶ 25, 27 (noting that in Aarness, the officers saw the defendant shove his hand between the cushion and armrest of a recliner in which he was sitting, causing the officers to fear that he was reaching for a weapon, and that in Smith, an officer who had initiated a traffic stop shortly before 3:00 a.m. saw the driver make a cell phone call, after which a Suburban with tinted windows pulled up behind the officer's patrol car, leading the officer to fear an ambush). The evidence in this case, in contrast, revealed no such ongoing threat. Rather, the People seek to justify the search and seizure at issue based on possibilities, speculation, and assumptions, without any supporting evidence. For the reasons set forth above, I do not believe that this kind of conjecture suffices to satisfy the People's burden of proof.

¶57 In sum, like the district court, I do not believe that the People have established the exigent circumstances necessary to justify the warrantless home entry at issue. As a result, in my view, the seizure of the guns at issue cannot be justified under the plain view doctrine. See People v. Gothard, 185 P.3d 180, 183 (Colo. 2008) (noting that to satisfy the plain view doctrine, the People must show, among other things, that the initial intrusion was legitimate). I therefore would affirm the district court's order suppressing the fruits of the unconstitutional search and seizure at issue.

### III. Conclusion

¶58 Today, the majority adopts a standard for exigent circumstances that in my view (and notwithstanding the majority's assurance to the contrary, see maj. op. ¶ 20, n.5)

would allow a warrantless entry into a suspect's home based on nothing more than a police officer's presumption, unsupported by any evidence, that people always lie. Because I believe that such a standard diminishes the protections afforded by the United States and Colorado Constitutions, and because I perceive no other evidence supporting a finding of exigent circumstances in this case, I would defer to the district court's findings and conclude that the warrantless search and seizure at issue were unconstitutional, thus requiring suppression of the fruits of that search and seizure.

¶59    Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE HART joins in this dissent.